UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:

CONTINUITYX, INC., *et al*,

                        Debtors.[1]

-------------------------------------------------------------x

ROBERT L. GELTZER, as Trustee of
CONTINUITYX, INC.,
CONTINUITYX SOLUTIONS, INC. and
METAMORA CLOUD SERVICES, INC.,

                        Plaintiff.

                        v.

LAWRENCE G. SALZMAN,

                        Defendant.

-------------------------------------------------------------x

Chapter 7

Case No. 13-10458 (MKV)
(Substantively Consolidated)

Adv. Pro. No. 17-01066 (MKV)

### *MEMORANDUM DECISION AND ORDER*
### *DENYING MOTION TO DISMISS*

APPEARANCES:

TARTER KRINSKY & DROGIN LLP
*Substitute Special Litigation Counsel to*
*Plaintiff, Robert L. Geltzer, as Chapter 7 Trustee*
1350 Broadway, 11th Floor
New York, New York 10018
By:    Robert A. Wolf, Esq.
        Jill Makower, Esq. (argued)

---

[1] The other debtors in this substantively consolidated case are Continuity X Solutions, Inc. (Case No. 13-10455) and Metamora Cloud Services, Inc. (Case No. 13-10459).

OKEEFE & ASSOCIATES LAW CORPORATION, P.C.
*Counsel to Defendant, Lawrence G. Salzman*
77 Water Street, 8th Floor
New York, New York 10005
By:    Sean A. O'Keefe, Esq. (argued)

FARRELL FRITZ, P.C.
*Co-Counsel to Defendant, Lawrence G. Salzman*
622 Third Avenue, Suite 37200
New York, New York 10017
By:    Patrick Collins, Esq.


MARY KAY VYSKOCIL
UNITED STATES BANKRUPTCY JUDGE

Robert L. Geltzer, as the Chapter 7 trustee (the "Trustee") of ContinuityX, Inc.

("ConX"), ContinuityX Solutions, Inc. ("Solutions") and Metamora Cloud Services, Inc.

("Metamora" and together with ConX and Solutions, the "Debtors") commenced this action

pursuant to Bankruptcy Code section 550 to recover allegedly fraudulent transfers from

Lawrence G. Salzman ("Salzman"), as the person for whose benefit the transfers were made

and, with respect to certain transfers, as a subsequent transferee.


Salzman moves to dismiss the Trustee's Complaint on the grounds that transfers are not

avoidable because the Trustee failed to avoid the transfers within the time prescribed under

Bankruptcy Code section 546(a), and the time within which the Trustee may commence such

an avoidance action has passed (the "Motion").    [ECF No. 4]  Thus, Salzman argues that the

transfers are no longer avoidable, and as such, the Trustee is precluded from recovering from

Salzman on account of those transfers under section 550.  (Memorandum of Points and

Authorities in Support of Motion to Dismiss Complaint (the "Brief" or "Brf.") ¶¶ 12-15,

attached to the Motion.)  Salzman also moves to dismiss the Complaint based on a second

2

argument, that the Trustee cannot recover the transfers from Salzman "based solely on the Defendant's status as a shareholder" of the initial transferee.[2] (Brf. ¶ 22) Rather, Salzman contends that any recovery against him must be preceded by a recovery from the alleged initial transferee, and then by recourse against Salzman "on some state law recovery theory, such as alter ego," which has not been asserted in the Complaint. (Brf. ¶ 23)

The Trustee opposes the Motion. (Plaintiff-Trustee's Memorandum of Law in Opposition to Defendant's Motion to Dismiss Complaint (the "Opp.")) [ECF No. 6] The Trustee asserts that a trustee is not required to obtain a judgment avoiding an alleged fraudulent transfer in order to recover that transfer under Bankruptcy Code section 550. (Opp. at 3) Instead, the Trustee contends that it is only necessary that the trustee timely commence an action to avoid a transfer under section 546(a), and timely commence a recovery action with respect to such transfer under section 550(f). (Opp. at 3)

The crux of the dispute turns, in large part, on the consequence, if any, of an action the Trustee timely commenced under sections 548 and 546, against the initial transferee, to avoid and recover the transfers that are the subject of this adversary proceeding, and subsequently dismissed without having obtained an order avoiding the transfers. Salzman contends that the fact that the Trustee commenced, and then subsequently dismissed, an avoidance action against the initial transferee does not overcome the Trustee's failure to commence an avoidance action *against Salzman* within the time required under section 546(a). (Brf. ¶ 21) The Trustee, on the other hand, contends that the Trustee's commencement of the avoidance action against the

---

[2] Although this basis for relief is not set forth in the Motion, it is raised and addressed in the Brief.

initial transferee, with respect to the transfers at issue in this action, within the time period

required under section 546(a), is sufficient for purposes of section 550. (Opp. at 11-13)  The

Trustee contends that his subsequent dismissal of the avoidance action because the defendants

were defunct entities, and the resulting failure to obtain an order avoiding the transfers in that

action, are irrelevant for purposes of determining whether the Complaint against Salzman is

timely.  (Opp. at 11-13)

In response to Salzman's second argument in support of dismissal, the Trustee asserts

that Bankruptcy Code section 550 permits a recovery against Salzman as the party for whose

benefit the transfers were made, and that a veil-piercing allegation is not an element of the

Trustee's recovery claim.

*       *       *

**Rule 12(b)(6) Standard**

Rule 7012(b) of the Federal Rules of Bankruptcy Procedure incorporates Rule 12(b)(6)

of the Federal Rules of Civil Procedure, under which a party may move to dismiss a complaint

for failure to state a claim upon which relief may be granted.  "To survive a motion to dismiss,

a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint states a claim that is

facially plausible when the factual content pleaded therein is sufficient to "allow[] the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft

v. Iqbal*, 556 U.S. at 678 (internal citation omitted).  For purposes of a Rule 12(b)(6) analysis, a

4

complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Cortec Indus., Inc. v. Sum Hldg. L.P.*, 949 F.2d 42, 77 (2d. Cir. 1991). When considering a motion to dismiss, a court must construe the complaint liberally, accept the factual allegations of the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Chen v. Major League Baseball Props., Inc*, 798 F.3d 72, (2d Cir. 2015); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1998).

Thus, solely for purposes of the Motion, the Court accepts as true the following facts set forth in the Complaint or in the exhibits thereto.

## BACKGROUND

The transactions at issue in the Complaint involve one of many fraudulent schemes carried out by ConX and Solutions, a publicly traded company, their President and Chief Executive Officer, David Godwin ("Godwin") and their Chief Financial Officer, Anthony Roth ("Roth").[3] The details of the alleged scheme are more fully set forth in the complaint filed by the Securities and Exchange Commission in the pending civil enforcement proceeding against Godwin and Roth, *U.S. Secs. and Exchange Commiss. v. Godwin*, 15-cv-1414 (C.D. Ill. 2015) (the "SEC Proceeding"), a copy of which is attached to the Complaint in this case as Exhibit A.

---

[3] On December 10, 2015, the United States filed a criminal indictment and proceeding against Godwin, Roth and John Colleti, a sales representative for ConX.

5

## A.   The Debtor's Pre-Petition Scheme

The scheme at issue concerned a contract between ConX and SBC Global Services, Inc. *d/b/a* AT&T Global Services ("AT&T"), dated April 13, 2011, pursuant to which ConX agreed to market and promote certain AT&T services to business customers (the "AT&T Contract"). (Complaint, ¶¶ 14, 15)  Pursuant to the AT&T Contract, once a customer procured by ConX entered into a contract to purchase services from AT&T (a "Customer Contract"), AT&T was obligated to pay ConX a commission of 11.55% of the value of the Customer Contract. (Complaint, ¶ 15)

Under a typical transaction initiated by ConX, Godwin and Roth approached various small companies and offered that, if the company would agree to act as a straw buyer of services provided by AT&T by entering into a Customer Contract, ConX would pay the company a percentage of the commissions ConX earned under the AT&T Contract as a result of such Customer Contract.  (Complaint, ¶ 21)  Godwin and Roth often referred to the straw buyers as "resellers" because these customers purportedly intended to resell the internet services they purchased from AT&T under a Customer Contract.  (Complaint, ¶ 21)  ConX often entered into a separate contract with its straw buyers (each, a "Reseller Agreement"), which typically provided that (a) the straw buyer would serve as a customer with AT&T but would bear no liability for performance under such contract, (b) ConX would accept an assignment of the Customer Contract and be substituted as the customer thereunder no later than nine months after AT&T accepted the straw buyer as a customer, and (c) ConX would pay the straw buyer a portion of the commission ConX earned under the AT&T Contract as a result

6

of the Customer Contract.  (Complaint, ¶ 21)  Throughout the course of the scheme, AT&T

paid commissions to ConX totaling approximately $9,057,993.  (Complaint, ¶ 19)  All of the

customers procured by ConX defaulted on their obligations to AT&T.  (Complaint, ¶ 19)  In

addition, over 99% of ConX's revenues reported to the Securities and Exchange Commission

were based on fraudulent sales transactions involving straw buyers or fabricated transactions.

(Complaint, ¶ 21)

On May 17, 2011, 1st USA.com Phonecards, Inc. ("1st USA") entered into a Reseller

Agreement with ConX, pursuant to which 1st USA agreed to serve as an AT&T customer with

no liability of performance (the "1st USA Reseller Agreement").[4]  (Complaint, ¶ 23)  In

exchange, ConX agreed to share with 1st USA 17% of the commission ConX earned under the

AT&T Contract as a result of the 1st USA Reseller Agreement.  (Complaint, ¶ 23)  At all times

relevant to the Complaint, Defendant Salzman was the sole officer and shareholder of 1st USA

and signed the 1st USA Reseller Agreement on behalf of 1st USA.  (Complaint, ¶ 26)

**B.  The Transfers**

In order for 1st USA to place an order for services from AT&T, AT&T required

1st USA to provide AT&T with an $180,000 security deposit (the "Security Deposit").

(Complaint, ¶ 29)  In accordance with the arrangement between ConX and 1st USA, on July 29,

2011, ConX made an $180,000 transfer to AT&T to serve as the Security Deposit for 1st USA

orders.  (Complaint, ¶ 31)  The transfer was made by means of a cashier's check procured by

ConX, which was made payable to AT&T.  (Complaint, ¶ 31)  In order to conceal the fact that

---

[4] A copy of the 1st USA Reseller Agreement is attached as Exhibit B to the Complaint.

7

ConX was making the Security Deposit, the cashier's check named 1st USA as the remitter.

(Complaint, ¶¶ 32, 33)  ConX obtained the funds to purchase the cashier's check pursuant to an

$180,000 loan from Salzman's late father, which ConX subsequently repaid in full, plus

interest.  (Complaint, ¶ 34)

In accordance with the commission sharing arrangement set forth in the 1st USA

Reseller Agreement, ConX made four payments to 1st USA totaling $183,555, including:

(1) $31,790 on June 21, 2011; (2) $76,500 on July 22, 2011; (3) $44,265 on August 23, 2011;

and (4) $31,000 on November 22, 2011 (collectively, the "1st USA Transfers").  (Complaint,

¶ 36)  The Trustee alleges that, according to 1st USA's bank statements, Salzman received a

direct, ascertainable and quantifiable benefit from the 1st USA Transfers.  (Complaint, ¶ 69)  In

addition, the Trustee alleges that certain of the 1st USA Transfers were passed along to

Salzman when Salzman caused 1st USA to issue a series of 14 checks, made payable to

Salzman, between June 2011 and January 2013, totaling $127,400.07 (collectively, the

"Subsequent Transfers").[5]   (Complaint, ¶¶ 68, 69)

## C.   The Debtors' Chapter 7 Cases and the Adversary Proceedings

On February 14, 2013 (the "Petition Date"), each of the Debtors commenced a case

under Chapter 7 of the Bankruptcy Code.  On February 12, 2015, the Trustee commenced an

adversary proceeding against 1st USA and SpeedyPin LLC ("SpeedyPin"), an entity affiliated

with Salzman, to avoid and recover the 1st USA Transfers and the $180,000 payment made in

---

[5] Two of the Subsequent Transfers were made on the same day that 1st USA received one of the 1st USA
Transfers, and certain other Subsequent Transfers were made shortly after 1st USA received certain of the 1st
USA Transfers.

connection with the Security Deposit (the "Security Deposit Transfer" and together with the

1st USA Transfers and the Subsequent Transfers, the "Transfers"), pursuant to sections 548 and

550 of the Bankruptcy Code (the "1st USA/SpeedyPin Action").  *See Geltzer v. SpeedyPin,*

*LLC*, Adv. Pro. No. 15-01050 (MKV).  After learning and confirming that 1st USA was

defunct, on June 1, 2016, the Trustee filed a notice dismissing the adversary proceeding against

1st USA (the "Dismissal Notice").  *See* Notice of Dismissal as Against Defendant 1st USA.com

Phonecards [Adv. Pro. No. 15-01050, ECF. No. 14].   After subsequently having learned, and

confirmed, that SpeedyPin was also defunct, pursuant to a stipulation dated April 25, 2017, the

Trustee dismissed the 1st USA/SpeedyPin Action as against SpeedyPin (the "Stipulation").

*See* Stipulation [Adv. Pro. No. 15-01050, ECF. No. 27].

Shortly thereafter, on May 30, 2017, the Trustee commenced this adversary proceeding,

pursuant to section 550, to recover from Salzman, (a) as the entity for whose benefit the

Security Deposit Transfer and the 1st USA Transfers were made, and (b) as a subsequent

transferee with respect to the Subsequent Transfers.

## *DISCUSSION*

It is well settled that the "concepts of avoidance and recovery are separate and distinct."

*In re AVI, Inc.*, 389 B.R.721, 733 (9th Cir. BAP 2008).  Bankruptcy Code section 548(a)(1),

one of the Code's avoidance provisions, authorizes a trustee to avoid any transfer of an interest

of the debtor in property that was made within two years of the petition date if the requirements

in either sub-section 548(a)(1)(A) or 541(a)(1)(B) are met.  11 U.S.C. § 548.  Bankruptcy Code

section 550(a), the Code's recovery provision, authorizes a trustee to recover a transfer from

9

the initial transferee, an entity for whose benefit the transfer was made, or a subsequent

transferee, "to the extent that a transfer is avoided" under the Code's avoidance provisions,

including section 548.  11 U.S.C. § 550(a).

The time limitations within which avoidance and recovery actions must be commenced

are set forth, respectively, in Bankruptcy Code sections 546 and 550.  Section 546(a) governs

*avoidance* actions and provides that an avoidance action under Bankruptcy Code section 548:

> may not be commenced after the earlier of:
>
> (1) the later of –
>
>> (A) 2 years after the entry of the order for relief; or
>>
>> (B) 1 year after the appointment or election of the first trustee . . .  if such appointment or election occurs before the expiration of the period specified in (A); or
>
> (2) the time the case is closed or dismissed. 11 U.S.C. § 546(a).

11 U.S.C. § 546(a).  Section 550(f) provides that a *recovery* action under section 550 must be

commenced no later than: (1) one year after the avoidance of the transfer on account of which

recovery is sought, <u>or</u> (2) the time the case is closed or dismissed, whichever is earlier.

11 U.S.C. § 550(f).  Thus, pursuant to section 546(a), the Trustee's action to *avoid* the transfers

made by ConX under section 548 must have been commenced by February 14, 2015 (two

years after the Petition Date), and pursuant to section 550(f), the Trustee's action to *recover* the

those transfers must be commenced within one year of the avoidance of the transfers or the

time the Debtors' case is closed or dismissed, whichever is earlier.

The issue before the Court is whether, as Salzman contends, the Trustee is precluded

from recovering the Transfers under Bankruptcy Code section 550 because, at the time the

Complaint to *recover* the Transfers was filed, the Transfers had not been avoided in the now-

dismissed 1st USA/SpeedyPin Action, and the time to bring an avoidance action had expired.
Stated another way, are the Transfers no longer *recoverable* under section 550 because, as
Salzman argues, the Transfers can no longer be *avoided* under section 548 since the Trustee
did not obtain a judgment of avoidance within the time required to bring an avoidance action
under Bankruptcy Code section 546.  More specifically, Salzman contends that the Transfers
are not avoidable because the 1st USA/SpeedyPin Action was dismissed without the Trustee
having obtained an order for the avoidance of the Transfers and, as such, the action is treated as
if it never had been commenced.  (Brf. ¶ 10)

    The Trustee acknowledges that if this were an action to avoid the Transfers, such action
would be time-barred under section 546.  (Opp. Brf. at 2)  The Trustee argues, however, that
the Trustee's *recovery* action against Salzman is not governed by section 546(a), but by
section 550(f) and that, under the law in this District, a trustee is not required first to avoid an
alleged fraudulent transfer in order to recover that transfer under section 550.  (Opp. Brf. at 3,
16, 17)  According to the Trustee, a transfer need not actually have been avoided, but rather, it
must be *avoidable*, in order for a trustee to recover the transfer under section 550.
Accordingly, the Trustee contends that because the 1st USA/SpeedyPin Action was timely
commenced under section 546(a), avoidance of the Transfers is timely for purposes of section
546(a), and the voluntary dismissal of that action without an order providing for the avoidance
of the Transfers does not negate the fact that the Trustee timely commenced an avoidance
action under section 546(a) for purposes of meeting the "avoidability" requirement of section
550.  (Opp. Brf. at 16, 17)

    Thus, the Court must decide whether the dismissal of the 1st USA/SpeedyPin Action

11

pursuant to the Dismissal Notice and the Stipulation, and the Trustee's failure to obtain an

order providing for the avoidance of the Transfers by February 14, 2015, renders the Transfers

unavoidable under section 546(a) and therefore precludes recovery under section 550.

The inevitable interplay between the Bankruptcy Code's avoidance provisions and the

section 550 recovery provision, and the time limitations within which each type of action must

be commenced, has been addressed by both the Bankruptcy Court and the District Court in

connection with actions commenced by the trustee (the "SIPA Trustee") appointed under the

Securities Investor Protection Act ("SIPA") to administer the substantively consolidated SIPA

liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L.

Madoff ("Madoff").  *See Picard v. Bureau of Labor Ins. (In re Bernard L. Madoff Inv. Secs.)*,

480 B.R. 501 (Bankr. S.D.N.Y. 2012);[6] *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec.*

*LLC, (In re Bernard L. Madoff Inv. Secs.)*, 501 B.R. 26 (S.D.N.Y. 2013).[7]

**A.      The Madoff Securities Cases**

The *Madoff Securities* cases concern actions brought by the SIPA Trustee, pursuant to

section 550, to recover from subsequent transferees allegedly fraudulent transfers made by

BLMIS.  The transfers had been made in connection with "the largest Ponzi scheme ever

discovered," which Madoff, prior to his arrest in December 2008, perpetrated through BLMIS.

*See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, (In re Bernard L. Madoff Inv.*

---

[6] This decision will be referred to herein as "*Madoff Secs. I*" or "*Madoff Securities I*."

[7] This decision will be referred to herein as "*Madoff Secs. II*" or "*Madoff Securities II*."

*Secs.)*, Adv. P. No. 08-01789 (SMB), 2017 WL 6900689, at *2 (Bankr. S.D.N.Y. Nov. 22, 2013).

The cases relevant here to the issue before the Court concern two feeder funds, Fairfield Sentry Ltd. ("Fairfield Sentry") and Kingate Global Fund Ltd. ("Kingate" and together with Fairfield Sentry, the "Funds") that had invested in BLMIS by pooling the assets of investors in the Funds' for investment with BLMIS. *See Madoff Secs. II*, 501 B.R. at 28. BLMIS made various payments to the Funds throughout the course of the Funds' investment relationship with BLMIS and the Funds, in turn, disbursed various portions of such payments to their investors. *See id.*

The *Madoff Securities* cases involve recovery actions brought by the SIPA Trustee against investors in the Funds to recover transfers that the investors had received from the Funds, pursuant to Bankruptcy Code section 550(a)(2), which authorizes a trustee to recover a transfer from a subsequent transferee.

   1.      *Madoff Securities I*

The *Madoff Securities I* case concerned a recovery action under section 550 of the Bankruptcy Code brought by the SIPA Trustee against the Taiwanese Bureau of Labor Insurance ("BLI"), an investor in Fairfield Sentry, as a subsequent transferee of an initial transfer made by BLMIS to Fairfield Sentry. *See Madoff Secs. I*, 480 B.R. at 506. BLI moved to dismiss the action on a number of grounds, including that the Recovery Action was time-

13

barred because the SIPA Trustee had not avoided the initial transfers from BLMIS to Fairfield

Sentry within the time required under section 546(a).  *See Madoff Secs. I*, 480 B.R. at 506.

The SIPA Trustee previously had commenced separate adversary proceedings against

each of the Funds, which were timely under section 546(a), asserting claims for avoidance and

recovery of transfers made to the funds by BLMIS.  *See Madoff Secs. II*, 501 B.R. at 28.

Shortly thereafter, both Fairfield and Kingate entered into liquidation proceedings in the British

Virgin Islands.  *See id.*  The SIPA Trustee then entered into a settlement agreement with

Fairfield Sentry's liquidators, pursuant to which Fairfield Sentry agreed to the entry of a

consent judgment in favor of the SIPA Trustee for the entire amount of the transfers sought to

be avoided (the "Fairfield Sentry Settlement").  *See Madoff Secs. II*, 501 B.R. at 28.  As a

result of the Fairfield Sentry Settlement, the SIPA Trustee's action to avoid the transfers made

by BLMIS to Fairfield Sentry was terminated,[8] and the SIPA Trustee did not obtain an order

avoiding those transfers prior to the expiration of the time prescribed for doing so under section

546(a).  Thereafter, the SIPA Trustee commenced an action against BLI, as subsequent

transferee, to recover the transfers and BLI moved to dismiss the complaint on the grounds that

it was time-barred.

The Bankruptcy Court denied BLI's motion to dismiss.  Judge Lifland reasoned that

"there is nothing in Section 550 suggesting 'that recovery from immediate transferees is in any

way dependent upon a prior action or recovery against the initial transferee . . . .  On the

contrary, avoidability is an attribute of the transfer rather than that of the creditor.'"  *See*

---

[8] The SIPA Trustee's action to avoid the transfers made to Kingate remained pending at the time of the Madoff
Securities I decision.  *See id.*

*Madoff Secs. I*, 480 B.R. at 520. (quoting *Kendall v. Sorani (In re Richmond Produce Co.)*, 195 B.R. 455, 463 (N.D. Cal. 1996)).  Moreover, Judge Lifland noted that "the majority of courts have found that Section 550 requires a transfer be avoidable; it does not require a trustee to litigate a final judgment of avoidance against initial transferees before seeking recovery from subsequent transferees."  *Id.* (citing 5 COLLIER ON BANKRUPTCY, ¶ 550.02[1] at 550–6 (16th Ed. 2011) ("The better view, adopted by the majority of courts is that . . . a recovery may be had from a subsequent transferee without suing the initial transferee.")

With respect to BLI's argument that the time to avoid the transfers had expired by the time the SIPA Trustee commenced the action to recover against BLI, the Court reasoned that "[u]nder these circumstances, the Trustee may recover from BLI under Section 550 because the Trustee timely filed a complaint against Fairfield Sentry alleging that the initial transfers from [BLMIS] to Fairfield Sentry are 'avoidable' under section 548 of the Code."  *Id.* Although the transfers were not avoided pursuant to a court order, Judge Lifland explained that "[u]nder the present circumstances where a settlement is at play, rigidly construing Section 550 to require a formal avoidance against Fairfield Sentry before permitting recovery against BLI makes little sense.  The Court reasoned that it was impractical for the Trustee to obtain such a judgment against Fairfield Sentry because it would have entailed protracted, expensive litigation with an insolvent entity in the midst of a liquidation proceeding with little chance of meaningful recovery."  *Id.* at 521.

In ruling that section 550 must be construed flexibly in connection with recovery actions against a subsequent transferee under the circumstances, the Court cited a District Court decision that had addressed a similar issue "with a situation where it was impossible and

15

impractical for the trustee to obtain a judgment of avoidance against the initial transferee"
because the initial transferee no longer existed. *Id.* at 520-21 (citing *Enron Creditors Recovery
Corp.* v. *Int'l Fin. Corp. (In re Enron Creditors Recovery Corp.),* 388 B.R. 489 (S.D.N.Y.
2008). In *Enron Creditors Recovery Corp.*, the Court explained that it was "necessary to leave
open the possibility of an exception where[,] for legal or practical reasons[,] it is impossible or
impractical to satisfy the precondition of an avoidance" of a transfer before permitting a
recovery from a subsequent transferee. *See id.* at 521 (quoting Transcript of Record at 38:4-
10, *In re Enron Creditors Recovery Corp.*, ECF No. 32).

The *Madoff Securities I* Court also cited to the ruling of another court addressing a
similar issue and explained that "[i]n the context of settlements in particular, it relied on such
flexibility to 'avoid [the] absurd result' of precluding a trustee from 'pursuing subsequent
transferees after settling with an initial transferee who does not admit liability.'" *Id.* at 521
(quoting *Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 735 (B.A.P. 9th
Cir. 2008)). The *Madoff Securities I* Court further noted that, in *AVI, Inc.*, the Court
emphasized that "Congress could not have contemplated this outcome [of precluding recovery
on statute of limitation grounds] in enacting § 550 because it would lead to trustees having
'little incentive to partially settle avoidance actions, thereby running up the costs of litigation
and causing further delay.'" *Id.* (quoting *In re AVI, Inc.*, 389 B.R. at 735).

Drawing on the rationale of earlier cases and the purpose of section 550, Judge Lifland
noted the absurdity that would result if a trustee were forced to choose between engaging in
burdensome litigation with an insolvent initial transferee and forfeiting the right to recover
from subsequent transferees on the grounds that a settlement would not involve a determination

16

on the merits of avoidance as to the initial transfer. *See id.* at 522. Thus, the Bankruptcy Court found that although the Fairfield Sentry Settlement did "not constitute a formal avoidance of the initial transfer from [BLMIS] to Fairfield, it presents the Court with finality with respect to Fairfield Sentry. This finality triggers the relevant one-year statute of limitations under section 550(f) of the Code." *See id.* at 522. Judge Lifland went on to explain that, without a court-approved stipulation resolving the avoidance action to serve as the trigger to start the running of the one year statute of limitations set forth in section 550(f)(1), a trustee would be permitted to bring an action against a subsequent transferee for an indefinite amount of time, and this would be a highly inequitable result. *See id.*

> 2.      *Madoff Securities II*

In *Madoff Securities II,* the District Court was called upon to further construe the extent to which a trustee may recover a transfer from a subsequent transferee under section 550 when the transfer has not been avoided under section 548. In the consolidated proceedings before the Court in *Madoff Securities II*, the SIPA Trustee similarly sought to recover payments made by Kingate and Fairfield Sentry[9] to their respective investors. *Madoff Secs. II*, 501 B.R. 28. In each of the recovery actions, the SIPA Trustee alleged that Fairfield and/or Kingate received avoidable transfers from BLMIS, and that portions of those initial transfers were subsequently transferred by the Funds to their customers; *i.e.* the subsequent transferees. *Madoff Secs. II*, 501 B.R. at 28. The customer defendants moved to withdraw the reference to the Bankruptcy

---

[9] Certain of the defendants in *Madoff Securities II* had received transfers from other Fairfield entities, including Fairfield Sigma Limited and Fairfield Lambda Limited. All of these entities are collectively referred to as Fairfield Sentry herein.

17

Court, and the District Court granted the motion with respect to two issues:

> (1) whether, as a precondition for pursuing a recovery action against a subsequent transferee under 11 U.S.C. § 550(a), the Trustee must first obtain a fully litigated, final judgment of avoidance against the relevant initial transferee under 11 U.S.C. §§ 544, 547 or 548 or

> (2) whether the Trustee's recovery action against a subsequent transferee under 11 U.S.C. § 550(a) must be dismissed unless the Trustee has obtained a judgment *against the relevant subsequent transferee* avoiding the initial transfer or he asserts a claim against the subsequent transferee to avoid the initial transfer within the period prescribed by 11 U.S.C. § 546(a).

*Madoff Secs. II*, 501 B.R. at 29 (internal citations omitted) (emphasis added).

The Court began its analysis by considering whether section 550's clause "to the extent a transfer is avoided" required, as a precondition for the SIPA Trustee's recovery action against the Funds' investors, that the SIPA Trustee first obtain a "fully litigated, final judgment of avoidance against the relevant initial transferee." *Madoff Secs. II*, 501 B.R. at 30. This issue was addressed in light of the fact that the SIPA Trustee, having entered into the Fairfield Sentry Settlement, had not obtained a judgment avoiding the transfers BLMIS made to Fairfield Sentry. *Madoff Secs. II*, 501 B.R. at 30. Consistent with Judge Lifland's ruling in *Madoff Securities I*, Judge Rakoff similarly concluded that a judgment of avoidance against an initial transferee is not a pre-condition necessary to a recovery from a subsequent transferee. The Court specifically rejected the argument that the language "to the extent a transfer is avoided" in section 550 requires that a trustee obtain a judgment of avoidance before a trustee may recover with respect to a transfer under section 550. *See Madoff Secs. II*, 501 B.R. at 31. Rather, the Court reasoned that the "'to the extent' language 'simply requires that transfers

18

sometimes may be avoided only in part, and that only the avoided portion of the transfer is

recoverable.'" *Madoff Secs. II*, 501 B.R. at 31-32 (quoting *In re AVI, Inc.*, 389 B.R. at 733).

To be clear, however, the Court noted that a trustee nevertheless may not recover a transfer

unless the trustee is able to prove that the transfer may be avoided "against the relevant

transferee at least contemporaneously with the recovery action."  *Madoff Secs. II*, 501 B.R. at

33.

The *Madoff Securities II* Court then considered whether the SIPA Trustee's failure to

commence an adversary proceeding against the Funds' customers - - the subsequent transferees

- - to avoid the transfers within the time required under section 546(a) precluded the SIPA

Trustee from recovering those transfers from the Funds' customers under section 550.  *See

Madoff Secs. II*, 501 B.R. at 34.  The Funds' customers had argued that even if the SIPA

Trustee had avoided the transfers that BLMIS made to the Funds, the SIPA Trustee's recovery

action against them must be dismissed because the SIPA Trustee failed to bring avoidance

actions *against them* within the statute of limitations provided under section 546(a), and that

time period had already run.  *See Madoff Secs. II*, 501 B.R. at 34.  The Court determined that

such a requirement would obligate a trustee to bring duplicative avoidance actions within the

section 546(a) statute of limitations period against subsequent transferees even when the

trustee has already brought such an action against the initial transferee.  *See Madoff Secs. II*,

501 B.R. at 34.  Accordingly, the Court held that a subsequent transferee may only have a

statute of limitations defense to avoidance if a trustee "failed to bring *any* avoidance action

with respect to the initial transfer (*against either the initial or subsequent transferee*) within

section 546(a)'s two-year limitations period."  *Madoff Secs. II*, 501 B.R. at 34 (emphasis

19

added).  The Court went on to hold that because the SIPA Trustee's avoidance actions against

Kingate and Fairfield were timely, the Funds' customers had no statute of limitations defense

to the recovery actions subsequently brought against them by the SIPA Trustee.  Citing *Madoff*

*Securities I*, the Court held that the SIPA Trustee was required, pursuant to section 550(f), to

bring a recovery action against Fairfield Sentry's investors (as subsequent transferees) within

one year of the Bankruptcy Court's approval of the Fairfield Sentry Settlement "as that

disposed of the case against Fairfield."  *Madoff Secs. II*, 501 B.R. at 36 (citing *Madoff Secs. I*,

480 B.R. at 522.)

## B.  The Salzman Adversary Proceeding

### 1.  *The Complaint is Timely*

This Court agrees with the Bankruptcy Court's reasoning in *Madoff Securities I* and is

bound by (and similarly agrees with) the District Court's ruling in *Madoff Securities II*.  Here,

as in the *Madoff Securities* cases, under the circumstances, it would have been impractical, if

not impossible, for the Trustee to obtain an avoidance judgment against 1st USA or SpeedyPin.

The Trustee timely commenced an avoidance action against 1st USA and SpeedyPin, and

subsequently discovered, as was the case in *Enron*, that the entities (1st USA and SpeedyPin)

were no longer operating.  There is no question that the Trustee commenced the 1st

USA/SpeedyPin Action to avoid the transfers within section 546(a)' state of limitation.

Moreover, it is not disputed that the recovery again against Salzman was brought within one

year of the Stipulation.  Applying the case law in this District, as discussed above, the Court

finds that under the circumstances, the dismissal of the 1st USA/SpeedyPin Action pursuant to

20

the Stipulation provides finality and serves as the trigger of the 1 year limitation period set

forth in section 550(f)(1).

Accordingly, the Court finds that Salzman has no statute of limitations defense to the

Trustee's recovery action.  For these reasons, this portion of the Motion is denied, and the

Complaint will not be dismissed on the grounds that it is untimely.  Nevertheless, the Trustee

will be required to prove that the Transfers were fraudulent and improper and Salzman will

have the right to argue that the Trustee is unable to prove any of the essential elements of his

case and to assert all applicable affirmative defenses.

2.    *The Complaint States a Claim*
      *Against Salzman under Section 550(a)(1)*

Although not enumerated in his motion as a basis for dismissal, Salzman also asserts in

his briefing that the Complaint fails to state a claim against him because the Transfers were

made to 1st USA, not Salzman, and section 550(a) does not permit the Trustee to recover from

Salzman simply because the Complaint alleges that Salzman was the sole shareholder of 1st

USA.  (Brf. ¶ 22)  Salzman contends that section 550 does not authorize the Trustee to

disregard corporate separateness, and that if the Trustee seeks to recover from Salzman as a

shareholder of 1st USA, the Trustee must first obtain a judgment against 1st USA, and then

proceed with an alter ego claim against Salzman.[10]  (Brf. ¶ 23)  Salzman's argument ignores

the plan language of Bankruptcy Code section 550.

---

[10] Salzman also asserts that any alter ego claim against him would be barred by the doctrine of *in pari delicto*.
(Brf. ¶ 23)

21

Section 550(a) lists the three types of entities from whom a trustee may recover an

avoidable transfer.  Section 550(a) (1) permits recovery from an initial transferee or the entity

for whose benefit the initial transfer was made and subjects both groups to strict liability.[11]  11

U.S.C. § 550(a) (1); *Christy v. Alexander & Alexander (In re Finley, Kumble, Wagner, Heine,*

*Underberg, Manley, Myerson & Casey*) ("*In re Finley, Kumble*"), 130 F.3d 52, 57

(2d Cir. 1997).  Section 550(a)(2) permits recovery from a subsequent transferee, subject to the

defenses set forth in section 550(b).[12]  It is not necessary to establish that a party who benefits

from an initial transfer exercises dominion and control over the funds transferred, otherwise the

Code would not distinguish such a party from an initial transferee in section 550(a)(1).

*See Secs Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 313

(Bankr. S.D.N.Y.1999).  Instead, a trustee seeking to recover under section 550(a)(1) against

an entity for whose benefit a transfer was made must allege that (1) the entity was the intended

beneficiary of the transfer, and (2) the intended benefit originated from the initial transfer.

*See id.* at 314.

Contrary to what Salzman suggests, the Trustee is not asserting in this adversary

proceeding an alter ego claim against Salzman, or arguing that section 550 permits recovery

from shareholders of an initial transferee.   Rather, the Trustee alleges that Salzman was the

---

[11] An initial transferee, however, may assert a "mere conduit" defense.  *See In re Finley, Kumble,* 130 F.3d at 56-58.

[12] Bankruptcy Code section 550(b) limits recovery against a transferee (a) provided value in exchange for the transfer and received the transfer in good faith and without knowledge of the voidability of the transfer or (b) received the transfer from a party who received the transfer for value, in good faith and without knowledge of the transfer's voidability.  *See* 11 U.S.C. §§ 550(a)(1), 550(b); *In re Finley, Kumble,* 130 F.3d at 57.

entity for whose benefit the 1st USA Transfers and the Security Deposit Transfer were made.[13]

(Complaint ¶¶ 66, 73)  With respect to the 1st USA Transfers, the Trustee alleges that Salzman

"was the sole officer and sole shareholder of 1st USA at the time of the Transfers and at all

times thereafter  . . . ."  (Complaint ¶ 66)  The Complaint also contains the following

allegations concerning the 1st USA Transfers:

- Salzman was the intended beneficiary of the 1st USA Transfers (Complaint ¶ 67);

- The intended benefit to Salzman of the 1st USA Transfers originated from the initial transfers (Complaint ¶ 68);

- Salzman wrote checks from 1st USA's account to distribute certain proceeds of the 1st USA Transfers to himself (Complaint ¶ 68); and

- 1st USA's bank statements, which indicate that Salzman caused 1st USA to make the Subsequent Transfers, show that Salzman "received direct, ascertainable and quantifiable financial benefit from the 1st USA Transfers." (Complaint ¶ 68)

These allegations clearly state a claim that is facially plausible under section 550.  *See Ashcroft*

*v. Iqbal*, 556 U.S. at 678.

With respect to the Security Deposit Transfer, the Trustee alleges in the Complaint that

Salzman is the person for whose benefit such transfer was made, that Salzman was the

intended beneficiary of such transfer, and that the intended benefit to Salzman of the transfer

originated from the initial transfer.  (Complaint ¶¶ 73-75)  The Trustee further asserts that the

intended benefit of the Security Deposit Transfer was to enable 1st USA to receive the 1st USA

Transfers, which ultimately were intended to benefit Salzman.  (Complaint ¶ 75)  Thus, the

---

[13] The Trustee also asserts in the Complaint that, pursuant to section 550(a)(2), the Trustee may recover the Subsequent Transfers from Salzman as a subsequent transferee.  (Complaint ¶¶ 78-81).

23

allegations set forth in the Complaint make clear that the Trustee is seeking to recover from Salzman under section 550(a)(1) on the grounds that Salzman is the entity for whom the 1st USA Transfers and the Security Deposit Transfer were made; not on the grounds that Salzman is simply a shareholder of 1st USA.  As such, the Complaint clearly contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  *See Ashcroft v. Iqbal*, 556 U.S. at 678.

## *CONCLUSION*

For the reasons discussed above, Salzman's Motion is denied.

**It is so ordered.**

Dated:  New York, New York
         March 22, 2018

                                             *s/ Mary Kay Vyskocil*
                                             Honorable Mary Kay Vyskocil
                                             United States Bankruptcy Judge